**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA WILDLIFE FEDERATION, INC.,
et al.,

      Plaintiffs,

v.                                              CASE NO. 4:08cv324-RH/WCS

LISA P. JACKSON, etc., et al.,

      Defendants.

_____/

## ORDER APPROVING CONSENT DECREE

      This is a dispute over water-quality standards in the State of Florida. The plaintiff environmental groups and the defendants—the United States Environmental Protection Agency and its Administrator—have agreed to entry of a consent decree. Various intervenors object. This order approves the proposed consent decree.

**I. Background**

      The objective of the Clean Water Act of 1972 was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The explicitly declared "national goal" was "that the discharge of

pollutants into the navigable waters be eliminated by 1985." *Id.* § 1251(a)(1). The goal was not achieved; it remains a work in progress.

The Act recognizes the primary responsibility of the states to prevent or reduce pollution. *See id.* § 1251(b). The Act thus allows a state to adopt its own water-quality standards, subject to the EPA Administrator's approval. If the Administrator determines that a state standard is not "consistent with" the Act's requirements, or that "a revised or new standard is necessary" to meet the Act's requirements, the Administrator must "promptly prepare and publish proposed regulations setting forth a revised or new" standard. *Id.* § 1313(c)(4). The Administrator must adopt the revised or new standard within 90 days after publication, unless by that time the state has adopted a revised or new standard that is approved by the Administrator. *Id.*

In 1998 the Administrator, together with the Secretary of the United States Department of Agriculture, reported that about 40 percent of the waters assessed by the various states did not meet water-quality goals. Letter from Carol Browner, Adm'r, U.S. Envtl. Prot. Agency and Dan Glickman, Sec'y, U.S. Dept. of Agric., to Albert Gore, Jr., Vice President of the United States (Feb. 14, 1998) (document 57-27 at 3). The Administrator and the Secretary adopted a Clean Water Action Plan intended to improve the situation. *See* U.S. Dep't of Envtl. Prot. & U.S. Dep't of Agric., *Clean Water Action Plan: Restoring and Protecting America's Waters*

58-59 (1998) (excerpted at documents 57-27 and 81-14).

Later in 1998, as part of the effort to implement the Clean Water Action Plan, the Administrator issued a report entitled, "National Strategy for the Development of Regional Nutrient Criteria." (*See* document 33-1.) As the report recognized, excessive nutrients—nitrogen and phosphorous—were a substantial part of the nation's water-quality problem. Many states, including Florida, had nonnumeric or "narrative" standards governing the introduction of nitrogen and phosphorous into water bodies. (*See id.* at 33-36.) The National Strategy report indicated that the EPA expected all states "to adopt and implement *numerical* nutrient criteria" by December 31, 2003. (*Id.* at 9) (emphasis added). There were good grounds to doubt that the narrative standards then in effect were adequately protecting the nation's waters. Affording the states five years to adopt numeric standards seemed reasonable.

By 2001 the State of Florida Department of Environment Protection was at work on the development of numeric nutrient standards. The Department, in conjunction with the state's Water Management Districts, conducted detailed studies and held meetings. But the state did not adopt or even propose numeric standards—not by December 31, 2003, and not by today, as 2009 draws to a close. Instead, the state retained its narrative standard: the concentration of nutrients in a water body must not be altered "so as to cause an imbalance in natural populations

of aquatic flora or fauna." Fla. Admin Code Ann. r. 62-302.530(47)(b). The standard proved inadequate. Nutrient pollution of the state's navigable waters continued and in many instances grew worse. Extensive and devastating algae blooms were not uncommon.

## II. This Lawsuit

Five environmental groups filed this lawsuit in July 2008.[1] They named as defendants the EPA and its Administrator. For convenience, this order refers only to the Administrator, without noting each time that the EPA itself is also a defendant. Over time, 13 entities intervened as defendants.[2]

The plaintiffs sought relief under the Clean Water Act's citizen-suit provision. It allows a citizen to sue the Administrator to compel her to perform a duty that the Act makes nondiscretionary. *See* 33 U.S.C. § 1365(a)(2). The plaintiffs asserted that the 1998 Clean Water Action Plan, or the 1998 National

---

[1] The plaintiffs are the Florida Wildlife Federation, Inc.; Sierra Club, Inc.; Conservancy of Southwest Florida, Inc.; Environmental Confederation of Southwest Florida, Inc.; and St. Johns Riverkeeper, Inc.

[2] The intervenors are Florida Pulp and Paper Association Environmental Affairs, Inc.; the Florida Farm Bureau Federation; Southeast Milk, Inc.; Florida Citrus Mutual, Inc.; Florida Fruit and Vegetable Association; American Farm Bureau Federation; Florida Stormwater Association; Florida Cattleman's Association; Florida Engineering Society; the South Florida Water Management District; the Florida Water Environment Association Utility Council, Inc.; the Florida Minerals and Chemistry Council, Inc.; and the Florida Department of Agriculture and Consumer Services.

Strategy report, constituted a "determination" that Florida's narrative nutrient standard was inadequate, thus imposing on the Administrator the nondiscretionary duty to "promptly" publish proposed new standards, and the further nondiscretionary duty to adopt new standards within 90 days after the publication. The Administrator and intervenors denied that the 1998 documents constituted a "determination."

Before the issue was resolved, the Administrator made an explicit and unequivocal determination that the Florida narrative nutrient standard was inadequate and that a revised or new standard was necessary to meet the Clean Water Act's requirements. The determination was made in a letter dated January 14, 2009, signed by the Administrator's designee. The determination did not render the original claim moot, because the publication of new standards could be sufficiently prompt after the 2009 determination but not sufficiently prompt after a 1998 determination; the assertion that the Administrator made a determination in 1998 thus could have entitled the plaintiffs to relief they could not have obtained based only on the 2009 determination.

Even so, the 2009 determination rendered the 1998 issue less important. The plaintiffs filed an amended complaint—denominated the "third amended supplemental complaint" because there had been two earlier amendments on other grounds—that added a claim for relief based on the 2009 determination. The

Administrator does not deny her nondiscretionary duty to promptly publish revised or new standards based on the 2009 determination. But at least some of the intervenors do deny the duty; they assert the 2009 determination was invalid.

On August 25, 2009, the plaintiffs and the Administrator moved for entry of a consent decree. The proposed consent decree would require the Administrator to sign for publication—by January 14, 2010, one year after the 2009 determination—numeric nutrient standards for Florida lakes and flowing waters. The proposed decree would require the Administrator to *adopt* standards by October 15, 2010. These requirements would not apply, however, if by the same deadlines the state proposed its own numeric standards and the Administrator approved them. The proposed decree would impose analogous deadlines one year later—on January 14, 2011, and October 15, 2011—for publication and adoption of numeric nutrient standards for coastal and estuarine waters. The proposed decree would allow an extension of a deadline by agreement between the plaintiffs and the Administrator, with notice to the court. The decree would allow an extension on the Administrator's motion, without the plaintiffs' consent, in the court's discretion.

All parties—including the intervenors—were allowed to file briefs, declarations, and other written evidence addressing the motion for entry of the consent decree. The parties presented extensive oral argument. The parties have

been fully heard.[3]

## III. Consent-Decree Standards

A court may properly enter a consent decree only if the settlement it incorporates is "fair, adequate, and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). As a general rule, "[d]istrict courts should approve consent decrees so long as they are not unconstitutional, unlawful, unreasonable, or contrary to public policy." *Stovall v. City of Cocoa, Fla.*, 117 F.3d 1238, 1240 (11th Cir. 1997). The decree must not violate the Constitution, statutes, or governing law. *Id.*; *Howard v. McLucas*, 871 F.2d 1000, 1008 (11th Cir. 1989). When the underlying claim is to enforce a statute, the consent decree must be consistent with the statutory objectives. *See White v. Alabama*, 74 F.3d 1058, 1074 & n.52 (11th Cir. 1996). And finally, a court must not enter a consent decree without the consent of a party whose rights would be affected. *See United States v. City of Hialeah*, 140 F.3d 968, 978-81 (11th Cir. 1998); *White*, 74 F.3d at 1073.

## IV. The Merits

The proposed consent decree easily meets these standards. First, this is a reasonable compromise—each side could have done better or worse by continuing

---

[3] In addition, the Northwest Florida, Southwest Florida, and Suwannee River Water Management Districts filed amicus curiae briefs.

to litigate. Second, the settlement was made at arm's length without collusion. Third, the proposed decree is consistent with the Clean Water Act's objectives, it is substantively reasonable, and it is not contrary to public policy. And fourth, all parties whose rights are affected have consented; the decree does not abridge the rights of the nonconsenting intervenors. This order addresses each of these conclusions in turn.

### A. *Reasonable Compromise*

As all sides seem to acknowledge, if the Administrator determines that a state standard is not "consistent with" the Clean Water Act's requirements, or determines that "a revised or new standard is necessary" to meet the Act's requirements, the Administrator has a nondiscretionary duty to "promptly prepare and publish proposed regulations setting forth a revised or new" standard. 33 U.S.C. § 1313(c)(4). Further, the Administrator has a nondiscretionary duty to adopt a revise or new standard within 90 days after the publication, unless by that time the state has adopted a revised or new standard and the Administrator approves it. *Id.*

The plaintiffs asserted that the Administrator determined in 1998 that narrative nutrient standards were inadequate to meet the Clean Water Act's requirements. The assertion was not frivolous. The 1998 Clean Water Action Plan and National Strategy report made clear that the existing regulations had not

achieved the Act's goals and that numeric nutrient standards were a necessary part of the solution. Still, it was by no means clear that the 1998 documents set forth a "determination" within the meaning of § 1313(c)(4). They did not explicitly announce a determination under § 1313(c)(4), and they contemplated that corrective action would be taken not "promptly" but only by the end of 2003. When the settlement was entered, neither side could have said with certainty that it would win the litigation over whether the 1998 documents constituted a "determination."

The 2009 determination, in contrast, was explicit and unequivocal. The Administrator said that the existing Florida nutrient standard was inadequate and that a revised or new standard was necessary to meet the Clean Water Act's requirements. The likelihood was high that the plaintiffs would win on the issue of whether the Administrator had a nondiscretionary duty to promptly publish a revised or new standard. The substantial issue was not whether, but how promptly, the Administrator was going to be required to act.

The plaintiffs and the Administrator agreed to deadlines that fit comfortably within the range of possible outcomes of the litigation. An earlier deadline could have been set, especially if the 1998 documents were deemed a determination. Even when analyzed based only on the 2009 determination, a delay of one year (for lakes and flowing waters) or two years (for coastal and estuarine waters) to the

publication of a proposed new standard might or might not have been deemed sufficiently "prompt." When the parties agreed to settle, neither side could have predicted with certainty whether a court ruling would have imposed an earlier or later deadline.

Importantly, the proposed consent decree also extends the deadline for adoption of a new standard after publication. And it provides for extensions of the deadlines by agreement or by court order. These are benefits for the Administrator—and for the intervenors and in some respects for the plaintiffs—that could not have been achieved through litigation alone.

In sum, the settlement was fair, adequate, and reasonable. It set deadlines for publishing proposed regulations that were close to those that likely would have been adopted as a result of continued litigation. And the settlement extended the deadline for adopting new standards after publication. Continued litigation would have cost more but otherwise probably would have benefitted nobody.

### B. *Absence of Collusion*

The plaintiffs and the Administrator began this litigation as opponents and agreed to settle at arm's length. Their attorneys were experienced in this field, showed commendable professionalism, represented their clients well, and negotiated reasonable settlement terms. The record includes not a hint of collusion.

Some of the intervenors assert, though, that the Administrator's real motivation in making the 2009 determination was not to protect Florida's waters but only to settle the lawsuit. The assertion is long on speculation and short on facts. This record and the determination letter itself include substantial evidence of excessive nutrients in Florida waters.

Moreover, even if there were grounds for challenging the 2009 determination, and even if those grounds could have been raised in defense of the plaintiffs' claims, this would not require the disapproval of the proposed consent decree. The issue for a court reviewing a proposed consent decree is not whether the plaintiff would necessarily have won the lawsuit, but only whether the proposed settlement—that is, the agreement to avoid a final decision and instead to resolve the case on agreed terms—is fair, reasonable, and adequate; is not the product of collusion; is consistent with the Constitution and laws; and preserves the rights of nonconsenting persons. That a party was motivated in part by the desire to avoid further litigation is hardly disqualifying.

This settlement did not result from collusion or any improper motivation.

### C. *Consistency with Clean Water Act and Public Policy*

This record does not definitively resolve the question whether Florida's narrative nutrient standard is adequate to meet the requirements of the Clean Water Act. The Administrator has determined, though, that it is not. This is an issue

properly resolved in the first instance by the Administrator.

Nothing in this record casts doubt on the Administrator's determination. Florida's waters have suffered substantial nutrient pollution. Algae blooms have been extensive and devastating. The narrative standard has not solved the problem. Any assertion that the narrative standard will measure up if given more time seems more than a little unrealistic.

Perhaps recognizing this, the intervenors' primary assertion is not that numeric standards are unnecessary, but that *appropriate* numeric standards cannot be put in place as quickly as the consent decree would require. Some intervenors suggest that *any* deadline would be unsupportable, because, they say, one cannot rush science.

Good managers often set deadlines, even on scientific endeavors. President Kennedy and the space program come to mind. In any event, the deadlines in the proposed consent decree are reasonable. The inadequacy of narrative standards was noted in 1998, more than 11 years ago. Florida agencies have been amassing data as a basis for numeric standards for nearly as long. Meanwhile, nutrient pollution has continued.

The Clean Water Act mandates "prompt" action when a state standard is determined to be inadequate. The proposed consent decree and its deadlines are fully consistent with the Act, substantively reasonable, and not contrary to public

policy.

### D. *No Abridgement of Rights*

Finally, the proposed decree does not abridge the rights of the intervenors or anyone else who has not consented.

The intervenors have no right to pollute Florida's waters or to introduce nutrients into them without numeric limits. The intervenors have no right to delay administrative action that is taken in compliance with the governing law.

To be sure, the intervenors who own property—or whose members own property—have a right not to have nutrient limits set at a level that would constitute a taking of their property, at least without the payment of just compensation. But nobody has proposed—or even suggested the possibility—that nutrient limits would be set at such a level. The consent decree surely does not require it.

The intervenors may also have a right not to be subjected to procedurally or substantively invalid nutrient standards. But the consent decree does not abridge the right; to the contrary, the consent decree scrupulously protects it. The decree contemplates the publication and adoption of standards in full compliance with all applicable procedural and substantive laws. The consent decree does not limit the intervenors' participation in the administrative process or the right to judicial review. The consent decree does not predetermine the result of the process.

Ignoring this, the intervenors suggest that the Administrator will propose and adopt unsupportable standards. But the suggestion has no basis in this record and fails to account for the Clean Water Act's extensive procedural and substantive safeguards—including the right to judicial review of any standard ultimately adopted. The conjured risk that the Administrator and a reviewing court ultimately will get it wrong is not a basis for rejecting the proposed consent decree.

One final point deserves mention. The consent decree obligates the Administrator to do nothing more than she could voluntarily choose to do anyway. The Administrator has already determined that the Florida narrative standard fails to meet the Clean Water Act's requirements. She could publish a revised or new standard for lakes and flowing waters by January 14, 2010, and for coastal or estuarine waters by January 14, 2011—and could do so earlier if she chose. She could adopt a revised or new standard as soon after publication as the administrative process would allow—and thus by October 15, 2010, or October 15, 2011. Any revised or new standard would have to comply with the governing procedural and substantive law and would be subject to judicial review—but the same is true under the consent decree. The intervenors challenge the underlying determination that Florida's narrative standard is inadequate, but with or without the consent decree, that determination will be equally subject to challenge—based on the same standard of review and with an equal level of deference to the

Administrator—on judicial review of any revised or new standard. The consent decree has compromised the intervenors' rights not at all.

## V. Conclusion

The EPA Administrator has determined that Florida's narrative nutrient standard is inadequate to meet the requirements of the Clean Water Act. The Act thus imposes on the Administrator the nondiscretionary duty to "promptly" publish a proposed new or revised standard and to adopt a standard within 90 days after the publication. The plaintiffs sued to enforce the duty. The plaintiffs and the Administrator reached a settlement calling for entry of a consent decree that sets deadlines of one and two years after the determination for the *publication* of standards, and nine months later for the *adoption* of standards. The proposed decree is fair, adequate, and reasonable; it is not the product of collusion; it does not violate the Constitution, statutes, or governing law; it is consistent with the Clean Water Act's objectives; and it does not affect the rights of any nonconsenting person. For these reasons,

IT IS ORDERED:

The motion for entry of the proposed consent decree (document 90) is GRANTED.  The consent decree is approved and will be separately entered.

SO ORDERED on December 30, 2009.

s/Robert L. Hinkle  
United States District Judge
