# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

FLORIDA WILDLIFE
FEDERATION, INC. et al.,

      Plaintiffs,

v.                          CASE NO.  4:08cv324-RH/CAS

GINA McCARTHY, Administrator
of the United States Environmental
Protection Agency, et al.,

      Defendants.

_____/

## ORDER MODIFYING THE CONSENT DECREE

This is the latest chapter in a long-running dispute over nutrient criteria for Florida waters.  A consent decree requires the Environmental Protection Agency to adopt *numeric* nutrient criteria for Florida's waters unless the state does so first.  The state has adopted new nutrient criteria, but for some waters, the criteria are not numeric.  The EPA has moved to modify the consent decree so that the state criteria can control across the board.  The plaintiff environmental organizations, who are parties to the consent decree, oppose the modification and have moved instead to enforce

the decree; they say the requirement for numeric criteria should be retained and that even some of the criteria that the state and the EPA label "numeric" are not. This order modifies the consent decree and denies the motion to enforce.

I

The background of this litigation is set out at length in the order of February 18, 2012, ECF No. 351. The basis for the consent decree is set out in the order of December 30, 2009, ECF No. 152. This order does not repeat all that was said there.

II

The plaintiffs are The Florida Wildlife Federation, Inc.; Sierra Club, Inc.; Conservancy of Southwest Florida, Inc.; Environmental Confederation of Southwest Florida, Inc.; and St. Johns Riverkeeper, Inc. They are referred to in this order as "the Florida Wildlife parties."

The defendants are the Environmental Protection Agency and its Administrator. For convenience, this order usually refers only to the EPA, without drawing a distinction between the EPA and its Administrator and without noting each time that the Administrator is also a defendant.

There are numerous intervenors. Some are political subdivisions or agencies of the State of Florida. Some are firms or individuals—or trade

associations whose members include firms or individuals—who introduce

nutrients into Florida waters. For convenience, this order refers to those

intervenors somewhat imprecisely as "state and industry parties."

III

Congress adopted the Clean Water Act in 1972. The objective was

"to restore and maintain the chemical, physical, and biological integrity of

the Nation's waters." 33 U.S.C. § 1251(a). The Act recognizes the primary

responsibility of the states to prevent or reduce pollution. *Id.* § 1251(b).

The Act thus allows a state to adopt its own water-quality standards, subject

to the EPA's approval.

In setting out the roles of the states and the EPA, the Act employs

three terms of art: "uses," "criteria," and "standards." *Id*. § 1313(c)(2)(A).

A state designates the "uses" for its navigable waters and sets "water quality

criteria" for the waters "based upon such uses." *Id*. A "standard" consists of

the uses and corresponding criteria. *Id*. The standard must "protect the

public health or welfare, enhance the quality of water and serve the purposes

of" the Act. *Id*. And the standard must "be established taking into

consideration [the waters'] use and value for public water supplies,

propagation of fish and wildlife, recreational purposes, and agricultural,

industrial, and other purposes, and also taking into consideration [the waters'] use and value for navigation." *Id*.

If a state standard is not "consistent with" the Act's requirements, or if the Administrator "determines that a revised or new standard is necessary" to meet the Act's requirements, the Administrator must "promptly prepare and publish proposed regulations setting forth a revised or new" standard. *Id*. § 1313(c)(4). The Administrator must adopt the revised or new standard within 90 days after publication, unless by that time the state has adopted a revised or new standard that is approved by the Administrator. *Id*. Whether the 90-day limit is judicially enforceable is less than clear. *See Miss. Comm'n on Natural Res. v. Costle*, 625 F.2d 1269, 1278 (5th Cir. 1980).

This case involves waters that Florida has designated as "class I" or "class III." The numbers run from most protected (class I) to least protected (class V). The designated uses of class III waters are "Fish Consumption; Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife," and they incorporate the additional uses of waters of a lower class: "Agricultural Water Supplies" and "Navigation, Utility and Industrial Use." Fla. Admin. Code r. 62-302.400(1) (2013); *see also id*. r. 62-302.400(6). The designated uses of class I waters incorporate

all these uses and add "Potable Water Supplies." *Id.* r. 62-302.400(1); *see also id.* r. 62-302.400(6).

## IV

Water-quality criteria can be numeric or narrative. Some of the parties have suggested a useful analogy: a state could adopt a numeric speed limit—70 miles per hour—or a narrative standard—don't drive too fast. Or a state could adopt a combination of both—don't drive over 70, and don't drive too fast for conditions.

Florida's longstanding criterion for nutrients, as in effect when the consent decree was entered, was *narrative*: "In no case shall nutrient concentrations of a body of water be altered so as to cause an imbalance in natural populations of aquatic flora or fauna." Fla. Admin. Code r. 62-302.530(47)(b) (2006). With limited exceptions, Florida did not have *numeric* nutrient criteria. *See* Order of February 18, 2012, ECF No. 351 at 13 & n.2.

## V

The Florida Wildlife parties filed this action in 2008. They asserted that documents issued by the EPA ten years earlier, in 1998, constituted a determination that Florida's narrative nutrient standard was inadequate, thus imposing on the EPA the nondiscretionary duty to adopt new standards. The

EPA, together with the intervening state and industry parties, denied that the 1998 documents constituted such a determination.

On January 14, 2009, the EPA exercised its explicit statutory authority to determine that a new standard—a standard using *numeric* nutrient criteria—was necessary for Florida to meet the Clean Water Act's requirements. This order sometimes refers to this as the "2009 determination" or simply "the determination." The EPA set out the basis for the determination in a ten-page letter. The letter noted that the determination obligated the EPA to promptly propose and adopt a new standard, unless Florida did so first.

The Florida Wildlife parties filed an amended complaint— denominated the "third amended supplemental complaint" because there had been two earlier amendments on other grounds—that added a claim for relief based on the 2009 determination. The EPA did not deny—and could not plausibly have denied—the nondiscretionary duty to promptly publish revised or new standards based on the 2009 determination; that was the whole point of the determination. But at least some of the state and industry parties did deny the duty; they asserted that the 2009 determination was invalid.

On August 25, 2009, the Florida Wildlife parties and the EPA moved for entry of a consent decree. The decree required the EPA to propose and adopt, in two phases, numeric nutrient criteria for Florida waters. In phase one, the decree required the EPA to sign for publication—by January 14, 2010, one year after the 2009 determination—a proposed rule setting numeric nutrient criteria for "lakes" (a term used there to include springs) and "flowing waters" (a term synonymous with "streams," the term most often used in this order). The proposed decree required the EPA to *adopt* such a rule by October 15, 2010. In phase two, the proposed decree imposed analogous deadlines one year later—on January 14, 2011, and October 15, 2011—for publication and adoption of numeric nutrient criteria for coastal and estuarine waters.

The consent decree explicitly provided that the EPA would *not* be required to propose or adopt standards if the state proposed its own numeric criteria and the EPA approved them. The decree thus recognized the Clean Water Act's allocation of responsibilities between the state and federal governments: establishing standards is the *state's* job, in the first instance, subject to EPA approval; the EPA takes over only if the state fails to adopt appropriate standards.

On December 30, 2009, I entered the proposed consent decree. A separate order explained at some length that the decree met the standards governing consent decrees. And the order continued:

> One final point deserves mention. The consent decree obligates the Administrator to do nothing more than she could voluntarily choose to do anyway. The Administrator has already determined that the Florida narrative standard fails to meet the Clean Water Act's requirements. She could publish a revised or new standard for lakes and flowing waters by January 14, 2010, and for coastal or estuarine waters by January 14, 2011—and could do so earlier if she chose. She could adopt a revised or new standard as soon after publication as the administrative process would allow—and thus by October 15, 2010, or October 15, 2011. Any revised or new standard would have to comply with the governing procedural and substantive law and would be subject to judicial review—but the same is true under the consent decree. The intervenors challenge the underlying determination that Florida's narrative standard is inadequate, but with or without the consent decree, that determination will be equally subject to challenge—based on the same standard of review and with an equal level of deference to the Administrator—on judicial review of any revised or new standard. The consent decree has compromised the intervenors' rights not at all.

Order Approving Consent Decree, ECF No. 152 at 14-15.

Two intervenors appealed the consent decree. In an opinion issued on August 2, 2011, the Eleventh Circuit dismissed the appeal for lack of standing, essentially agreeing with my ruling that the 2009 determination—not the consent decree—was the source of any harm allegedly suffered by

the state and industry parties.  *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water*

*Mgmt. Dist.*, 647 F.3d 1296 (11th Cir. 2011).

## VI

The EPA went forward as required by the consent decree, sometimes

with extensions of the deadlines.  The decree allowed extensions by

agreement between the Florida Wildlife parties and the EPA, with notice to

the court.  And the decree allowed extensions on the EPA's motion, without

the Florida Wildlife parties' consent, in the court's discretion.

One extension was this.  In June 2010, the Florida Wildlife parties and

the EPA agreed to extend the deadlines for streams in the South Florida

region, in effect moving those waters from phase one to phase two.

On November 14, 2010, the EPA adopted a phase-one rule setting

numeric nutrient criteria for lakes and springs and for streams outside the

South Florida region.  The rule was challenged from both sides under the

APA and on other grounds.  Some parties asserted the EPA did too much;

some asserted the EPA did too little.  The challenges came in the original

case and in a series of new cases that eventually were consolidated with the

original case.

The order of February 18, 2012, upheld the EPA's 2009 determination

that numeric nutrient criteria were necessary.  The order upheld the phase-

one rule except for the stream criteria and the downstream-protection criteria for unimpaired lakes. With those exceptions, the phase-one rule took effect on January 6, 2013. The invalidated provisions were remanded to the EPA. On November 4, 2013, the Eleventh Circuit dismissed an appeal for lack of jurisdiction—that is, for lack of a final judgment on all issues among all parties.

After extensions, the deadline for the EPA to adopt a rule replacing the invalidated phase-one criteria was August 31, 2013. The deadline for the EPA to adopt a phase-two rule was September 30, 2013. But before those deadlines, the EPA approved rules adopted by the Florida Department of Environmental Protection ("FDEP") setting nutrient criteria for the affected waters. The criteria for some waters were plainly numeric; for those waters, the approval of the state criteria abrogated the EPA's obligation under the consent decree to adopt its own rules. The deadline for the EPA to adopt criteria for the remaining waters has been stayed pending issuance of this order.

## VII

On June 13, 2012, the FDEP submitted to the EPA for approval a set of nutrient criteria for all Florida waters. *See* Fla. Admin. Code Ann. ch. 62-302 & 62-303 (2013). The FDEP's proposal included *numeric* criteria for

only some waters; the FDEP proposed to govern other waters with *narrative* criteria, albeit criteria that incorporated a quantitative approach. The FDEP's proposal included numeric criteria for lakes and springs that mirrored the EPA's criteria. The FDEP's proposal used nonnumeric criteria for downstream protection, jettisoning the EPA's numeric downstream-protection criteria. The FDEP's proposal used narrative criteria for South Florida streams and for marine lakes, tidally influenced streams, and conveyances primarily used for water-management purposes with marginal or poor stream habitat components. And the FDEP's proposal included numeric components that it said constituted numeric nutrient criteria for other streams, estuaries, and coastal waters.

The EPA reviewed the FDEP's proposed criteria and concluded that they met the requirements of the Clean Water Act. The EPA's approval of a state water-quality standard is judicially reviewable under the Administrative Procedure Act, but the Florida Wildlife parties have not filed an APA challenge. Nothing in this record indicates that the EPA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is the standard under which a court reviews administrative actions of this kind.

# VIII

In response to the FDEP's actions, the EPA has twice amended the 2009 determination.

First, on November 30, 2012, the EPA concluded that Florida's approach to the protection of downstream waters—an approach that does not use *numeric* downstream-protection criteria—meets the Clean Water Act's requirements.

Second, on June 28, 2013, the EPA concluded that, in light of developments since the 2009 determination, numeric nutrient criteria are not necessary to meet the Clean Water Act's requirements for the waters for which the FDEP did not adopt criteria it said were numeric—that is, for South Florida streams and for marine lakes, tidally influenced flowing waters, and conveyances primarily used for water-management purposes with marginal or poor stream habitat components.

The amendments to the 2009 determination are administrative actions that are subject to challenge under the APA. But the Florida Wildlife parties have not filed an APA challenge. The record in this litigation does not include the entire administrative record that led to the amendments. But nothing in this record suggests that the EPA's actions were "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A).

IX

The amendments to the 2009 determination do not, standing alone,

affect the EPA's obligations under the consent decree. The consent decree is

a binding injunction. Unless the decree is modified, the EPA must adopt

numeric nutrient criteria for all affected waters for which the FDEP did not

adopt numeric criteria. Recognizing this, the EPA has moved to modify the

consent decree to conform with the amendments to the 2009

determination—that is, to eliminate the requirement for numeric nutrient

criteria that, as recognized by the amendments, are not necessary to meet the

Clean Water Act's requirements.

Federal Rule of Civil Procedure 60(b) allows modification of a

judgment or order for specified reasons:

> On motion and just terms, the court may relieve a party
> or its legal representative from a final judgment, order, or
> proceeding for the following reasons:
>
> . . . .
>
> (5) . . . applying [the judgment] prospectively is no
> longer equitable; or
>
> (6) any other reason that justifies relief.

The rule applies to consent decrees, even those requiring action by a governmental entity to comply with standards affecting the public interest. *See, e.g.*, *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992).

   *Rufo* addressed a decree setting pretrial-detention standards for a local jail. The Supreme Court referred to this as "institutional reform litigation" and cited *Brown v. Board of Education*, 347 U.S. 483 (1954), as another example of such litigation. The Florida Wildlife parties say the case at bar also is "institutional reform litigation." The description may not accurately describe this case, but the *Rufo* analysis of Rule 60(b) plainly applies here. No party contends otherwise.

   The Florida Wildlife parties say *Rufo* set an exacting standard inconsistent with modification of the consent decree in this case. But *Rufo* did nothing of the kind. To the contrary, *Rufo* rejected the assertion that a consent decree can be modified only on "a clear showing of grievous wrong evoked by new and unforeseen conditions." *Rufo*, 502 U.S. at 379 (quoting *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932)). Instead of embracing this "grievous wrong" standard, *Rufo* noted the "traditional flexible standard for modification of consent decrees," noted that a post-*Swift* decision, *Railway Employes v. Wright*, 364 U.S. 642 (1961), had "emphasized the need for flexibility in administering consent decrees," and

said the upsurge in institutional-reform litigation had "made the ability of a

district court to modify a decree in response to changed circumstances all the

more important." *Rufo*, 502 U.S. at 379-80.

The Eleventh Circuit has said that, under *Rufo*, a party seeking to

modify a consent decree "must show, first, 'a significant change either in

factual conditions or in law,' *id*. at 384, 112 S.Ct. at 760, and, second, that

'the proposed modification is suitably tailored to the changed circumstance.'

*Id*. at 391, 112 S.Ct. at 763." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1033

(11th Cir. 2002). "A party seeking to modify a consent decree has a high

hurdle to clear and the wind in its face." *Id*. at 1034. "Long standing

precedent evinces a strong public policy against judicial rewriting of consent

decrees." *Reynolds v. Roberts*, 202 F.3d 1303, 1312 (11th Cir. 2000).

Based on these standards, modification is appropriate here. The

FDEP's adoption of comprehensive new nutrient criteria is a significant

change in the factual conditions and law. The studies and analysis that led to

the FDEP's adoption of its approach are a significant change in the factual

conditions. Indeed, appropriate numeric nutrient criteria for streams had

proven elusive, as shown by the invalidation of the EPA's initial rule

adopting such criteria. Both the FDEP and EPA now agree that Florida's

approach meets the requirements of the Clean Water Act.

The EPA's proposed modification of the consent decree is suitably
tailored to—indeed, a perfect match with—the changed circumstances. Both
the 2009 determination and the consent decree will remain in force except to
the extent inconsistent with approval of the FDEP's alternative approach.

So the proposed modification meets the requirements of *Rufo* and
*Meiburg*. In the language of Rule 60(b), applying the affected provisions of
the consent decree prospectively is no longer equitable.

And the modification makes sense on a broader view as well. Had the
FDEP adopted the new criteria before the EPA's 2009 determination, the
determination would have been modified—as now has occurred—to
eliminate any inconsistent requirement. Neither the 2009 determination nor
the consent decree was intended to change the Clean Water Act's allocation
to the state of primary responsibility for setting water-quality criteria. Nor
were they intended to foreclose an approach based on further study and
analysis, so long as the approach was consistent with sound science.

In opposing the modification, the Florida Wildlife parties assert that
modification of a consent decree is never appropriate based on a change in
circumstances wholly within the defendant's own control. The assertion is
wrong on both the law and the facts.

First, the law. Nothing in Rule 60(b) or in such cases as *Rufo* and *Meiburg* forecloses a modification based on circumstances within a party's own control. Indeed, circumstances within a party's own control may present the very paradigm of a proper case for modification. Examples include a school district that, through its own good efforts, has become unitary, or a public employer that, through its own good efforts, has eliminated racial discrimination. If modification were not allowed in these circumstances, injunctions or consent decrees would remain in effect long after they were needed.

Second, the facts. The changed circumstances that make modification appropriate here include the FDEP's further study and analysis and its adoption of comprehensive nutrient criteria. The EPA's amendments to the 2009 determination are also changed circumstances, but the amendments standing alone, without the FDEP's adoption of its own criteria, would not have led to modification of the consent decree. In short, this modification is not being granted based on circumstances wholly within the EPA's own control.

The Florida Wildlife parties base their "own control" argument on language in *Rufo* taken completely out of context. *See* Pls.' Resp. to Mot. To Modify the Consent Decree, ECF No. 440 at 7. *Rufo* cited a lower-court

case in which a consent decree was properly modified "in light of changes in circumstances that were beyond the defendants' control and were not contemplated by the court or the parties when the decree was entered." *Rufo*, 502 U.S. at 380-81 (describing *Phila. Welfare Rights Org. v. Shapp*, 602 F.2d 1114, 1119-21 (3d Cir. 1979)).  But citing a case in which there were changed circumstances beyond a defendant's control comes nowhere close to a holding that a decree can be modified *only* when there are changed circumstances beyond the defendant's control.  The Florida Wildlife parties' argument confuses a sufficient condition with a necessary one.

*Rufo* explicitly embraced Rule 60(b) and mandated a flexible approach.  *Rufo* did not impose a rigid requirement for changed circumstances beyond a defendant's control.  Modification is proper here.

## X

Modification of the consent decree to conform with the amendments to the 2009 determination only partially moots the Florida Wildlife parties' motion to enforce the decree.  The Florida Wildlife parties assert that the EPA has failed to comply with the consent decree in two additional respects.

## A

First, the Florida Wildlife parties assert that for streams that remain subject to the consent decree's requirement for numeric nutrient criteria, the

FDEP has adopted only numeric thresholds, not numeric criteria that meet the requirements of the consent decree. The consent decree requires "[n]umeric water quality criteria for nutrients" that "consist of numeric values that EPA determines are protective of the designated uses of waters." Consent Decree, ECF No. 153 at 4 ¶ 3. The FDEP's numeric nutrient thresholds for streams meet this definition.

In arguing the contrary, the Florida Wildlife parties mistakenly assert that a stream's failure to meet the FDEP's numeric thresholds will not render the stream impaired unless a site-specific study shows that the stream is in fact impaired. Not so. The FDEP's approach allows site-specific studies, but a stream that fails to meet the numeric thresholds must be treated as impaired until a site-specific study shows otherwise. *See* Fla. Admin. Code r. 62-303.390(2)(e) (requiring the placement of such a stream on the impaired-waters study list).

Allowing site-specific studies is not inconsistent with the consent decree. The point of the endeavor is to protect against adverse effects on flora or fauna. Under the EPA's original approach, a water body that exceeds the prescribed nitrogen or phosphorous levels is deemed impaired, while a water body that complies with the prescribed levels is deemed unimpaired. But when judged by the effects on flora and fauna, sometimes a

water body that exceeds the prescribed levels is in fact unimpaired.

Sometimes a water body that complies with the prescribed levels is in fact

impaired. The FDEP rule uses as its starting point nitrogen and phosphorous

levels like those the EPA incorporated into its own proposed rule. But the

FDEP rule allows a site-specific analysis to properly classify a water body

based on the actual effects on flora and fauna. If properly and honestly

implemented, this is an improvement. And in any event, nothing in this

approach is inconsistent with the consent decree.

B

Second, the Florida Wildlife parties assert that the FDEP rules

improperly exclude intermittent streams from their coverage. That is not so.

The FDEP rule, like the 2009 determination and the EPA's own stream rule

as originally proposed, applies to intermittent streams with taxa

characteristic of streams. The FDEP rule, like the 2009 determination and

the EPA's own stream rule as originally proposed, does not apply to streams

with taxa characteristic of wetlands. This is entirely proper; the consent

decree does not apply to wetlands. *See* Consent Decree, ECF No. 153 at

¶¶ 4, 8.

To be sure, the FDEP rule also excludes intermittent streams with taxa

characteristic of uplands. The EPA has explained that this accounts for very

dry periods when terrestrial taxa may come to dominate wetlands.  In any event, the Florida Wildlife parties failed to raise this dispute with the EPA under the procedures required by the consent decree.  The issue provides no basis for entry of an order enforcing the decree.

XI

For the reasons set out to this point, this order grants the EPA's motion to modify the consent decree and denies the Florida Wildlife parties' motion to enforce the decree.  The decision is further supported by—but would be entered separate and apart from—the discussion that follows.

A consent decree cannot be entered without the consent of a party whose rights would be affected.  *See United States v. City of Hialeah*, 140 F.3d 968, 978-81 (11th Cir. 1998); *White v. Alabama*, 74 F.3d 1058, 1073 (11th Cir. 1996).  Over the objection of numerous intervenors, I entered the consent decree, concluding that their rights would not be affected.  *See* ECF No. 152.  The Eleventh Circuit agreed and dismissed for lack of standing the attempt of some of the intervenors to appeal the consent decree.

Had the FDEP adopted its new rules and had the EPA approved them and amended the 2009 determination before entry of the consent decree, the Florida Wildlife parties would have had, at most, a right to challenge the approval under the APA; the Florida Wildlife parties would have had no

right to relief in this citizen's suit. The Florida Wildlife parties' position on the pending motions thus rests on the proposition that the consent decree put the state and industry parties in substantially worse position than they occupied before the decree was entered. That proposition is squarely at odds with the position the Florida Wildlife parties successfully advocated in support of the consent decree. If, as the Florida Wildlife parties now apparently assert, the consent decree affected the state and industry parties' substantial rights, the consent decree should not have been entered, and the appeal from the decree should not have been dismissed.

The answer is that the consent decree did not affect the state and industry parties' substantial rights. The decree was properly entered, and the appeal was properly dismissed. The Florida Wildlife parties may not be judicially estopped from asserting the contrary. But they are asserting in the district court a position inconsistent with the prior ruling of the Eleventh Circuit. That is a losing proposition.

The prior rulings of this court and the Eleventh Circuit were correct because the consent decree required administrative action that the EPA was free to take if it chose, with or without the consent decree. And if circumstances changed, as they have, the consent decree could be modified, as Rule 60(b) provides. Now, as then, the primary responsibility for

adopting standards meeting the Clean Water Act's requirements rests with the State of Florida, subject to the EPA's approval. Now, as then, the Clean Water Act depends in part on honest administrative enforcement of duly adopted standards. At least as shown by this record, the FDEP's new standards have been duly adopted.

XII

For these reasons,

IT IS ORDERED:

1.    The EPA's motion, ECF No. 424, to modify the consent decree, ECF No. 153, is GRANTED. The decree is amended to exclude any requirement to adopt numeric downstream-protection criteria or numeric nutrient criteria for South Florida streams or for marine lakes, tidally influenced streams, or conveyances primarily used for water-management purposes with marginal or poor stream habitat components.

2.    The Florida Wildlife parties' motion, ECF No. 438, to enforce the consent decree is DENIED.

SO ORDERED on January 7, 2014.

s/Robert L. Hinkle
United States District Judge